UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| KENNETH FENNELL § <br> § <br> Plaintiff, § <br> vs. § <br> § <br> BAYLOR HEALTH CARE SYSTEM § <br> d/b/a BAYLOR REGIONAL MEDICAL § <br> CENTER AT PLANO; and BAYLOR § <br> REGIONAL MEDICAL CENTER AT § <br> PLANO § <br> § <br> Defendants. § | CIVIL ACTION NO. _____ <br><br> DEMAND FOR JURY TRIAL |

# PLAINTIFF'S FIRST AMENDED COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW**, Plaintiff KENNETH FENNELL, Individually, ("Plaintiff") to complain of BAYLOR HEALTH CARE SYSTEM d/b/a BAYLOR REGIONAL MEDICAL CENTER AT PLANO; and BAYLOR REGIONAL MEDICAL CENTER AT PLANO ("Defendants"), and alleges the following:

## I.
## JURISDICTION AND VENUE

1. This Court has jurisdiction and venue is proper because one or more acts or omissions forming the basis for liability occurred in Dallas County, Texas, and Defendants are corporate entities located in Dallas County, Texas. Further, this lawsuit may affect the outcome of a pending bankruptcy proceeding. *See* 28 U.S.C. § 1334(b).

2. The bankruptcy proceeding mentioned above is Case No. 1:13-bk-20510, *In Re Christopher Daniel Duntsch*, filed in the United States Bankruptcy Court, District of Colorado.

## II.
## PARTIES

3. Plaintiff KENNETH FENNELL is an individual residing at 820 Topaz Lane, Oak Point, Denton County, Texas 75068.

4. Defendant BAYLOR HEALTH CARE SYSTEM d/b/a BAYLOR REGIONAL MEDICAL CENTER AT PLANO is a corporation with its Registered Office at 2001 Bryan Street, Suite 2300, Dallas, Texas 75201-3063. It may be served with process by serving its registered agent, CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

5. Defendant BAYLOR REGIONAL MEDICAL CENTER AT PLANO is a corporation with its Principal Office and its Registered Office at 2001 Bryan Street, Suite 2300, Dallas, Texas 75201-3063. This Defendant may be served with process by serving its registered agent, CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

6. For clarity, Baylor Health Care System d/b/a Baylor Regional Medical Center at Plano and Baylor Regional Medical Center at Plano will hereinafter be referred to as "The Baylor Defendants or Baylor."

## III.
## PRE-SUIT STATUTORY COMPLIANCE

7. Plaintiffs have complied with the pre-suit notice requirements of Texas Civil Practice and Remedies Code, Chapter 74. Plaintiff invoked the tolling provision of Texas Civil Practice and Remedies Code § 74.051(c) by timely providing pre-suit notice to one or more parties or potential parties.

# IV.
# FACTUAL BACKGROUND

8. The claims against Baylor Plano pertain to their approximate nine (9) month affiliation with a Dr. Christopher Duntsch. Dr. Christopher Duntsch is, by training, a neurosurgeon. However, he does not possess a valid license to practice medicine at this time.

9. In late 2010, Dr. Duntsch completed a six year residency and fellowship in Tennessee. In year four of his residency, he was suspected of using cocaine and was sent to an impaired physician program.

10. Specifically, a nurse at the hospital where Dr. Duntsch worked witnessed him using cocaine the night prior and the early morning before going to the hospital to perform surgery. This nurse questioned Dr. Duntsch about him using cocaine and being under the influence of cocaine during surgery, and he told her not to worry. That he used cocaine and operated on patients all the time. This nurse called the neurosurgery residency program and informed them of such. They immediately had human resources call him down under a pretense that they were performing random drug screens. Dr. Duntsch responded by stating that he needed to go up to the ICU to take care of a patient, but that he would be right back. Then, he did not show up at the hospital for three days. When Dr. Duntsch finally returned to the hospital, he was sent to an impaired physician program in Tennessee. He was there for several months, possibly up to a year. Regardless, he was allowed to complete the residency program, as well as a fellowship, which entitled him to thereafter perform neurosurgery on patients.

11. In July 2011, Dr. Duntsch came to Dallas to practice neurosurgery. He had not been in the operating room for approximately a year and a half. He had been in the lab doing research and not operating on patients. Dr. Duntsch was recruited by Baylor who joint ventured a deal with The Minimally Invasive Spine Institute of Dallas (hereinafter referred to as MISI). On July 1, 2011, a "Physician Practice Start-Up Assistance Agreement" was entered into between Baylor Regional Medical Center at Plano, Christopher Duntsch, M.D., and Minimally Invasive Spine Institute, P.A. (attached hereto as Exhibit "A").

12. One of the stated purposes of the agreement was Baylor Plano's desire to "…induce the Physician to relocate to the Hospital Service Area and to join the Hospital's Medical Staff…"

13. Said "inducement" included the hospital paying Duntsch up to fifteen thousand dollars ($15,000.00) for relocation expenses, providing "operating expenses" not to exceed forty-four thousand dollars ($44,000.00) per month for a period of one year. In addition, the agreement called for hospital to pay fifty thousand dollars ($50,000.00) per month as "guaranteed income" for one year. The hospital also agreed to advance to MISI on behalf of Duntsch the sum of six hundred thousand dollars ($600,000.00).

14  In addition, "As compensation for Physician's services and in consideration of Physician's other agreements and covenants as set forth herein", Minimally Invasive Spine Institute (MISI) entered into a Physician's Service Agreement with Dr. Duntsch (attached hereto as Exhibit "B"), which among other things, obligated MISI to pay Dr. Duntsch a base salary of six hundred thousand dollars ($600,000.00) beginning May 24, 2011. It also entitled Duntsch to attractive bonuses, which amounted to forty (40)

percent of all gross collections by MISI for Duntsch's billings in excess of eight hundred thousand dollars ($800,000.00). The initial term was for two years with an automatic extension of additional successive one (1) year periods, unless either party gives notice of their intent to terminate the agreement at least one hundred and twenty (120) days prior to the next scheduled expiration date. In addition, the agreement could be terminated immediately by MISI if Duntsch became unable to fully perform his duties because of a physical or mental incapacity. Dr. Duntsch's employment was specifically conditioned upon execution of the "Physician Recruitment Agreement" between Duntsch, MISI and Baylor Plano.

15. Further, a promissory note was signed by Duntsch and MISI unconditionally promising to pay Baylor Regional Medical Center at Plano the principle sum of six hundred thousand dollars ($600,000.00) with interest (attached hereto as Exhibit "C"). The note was to be re-paid beginning on the first anniversary of the note, which would have been approximately July 1, 2012. However, the terms also included "forgiveness" of the debt at the rate of one-third ($1/3^{rd}$) of the loan balance after the first year, one-half (½) of the loan balance after the end of the second year, and the remainder of the loan balance after the end of the thirty-sixth (36th) month after the end of the guarantee period (twelve (12) months from the commencement date of July 1, 2011).

16. In addition to the financial compensation Baylor Plano used to incentivize Duntsch to perform surgeries at their facility and to induce MISI to hire Duntsch, Baylor Plano also provided marketing dollars and employed one or more marketing agents to create patients for Duntsch. Baylor Plano also encouraged its own physicians to refer patients to Duntsch.

17. Dr. Duntsch moved to Dallas with his long time friend and roommate Jerry Summers. Mr. Summers ran errands for Duntsch, served as his chauffeur, maintained his home, and was known to partake in illicit drug use with Duntsch.

18. Initially, Duntsch and Mr. Summers stayed at The W Hotel where Duntsch was known to be a regular at the Ghost Bar. They then moved their residence to the Hotel ZaZa, where Duntsch bragged about their parties and about tearing up their hotel room.

19. Duntsch did not last more than approximately ninety (90) days at MISI. That relationship terminated on September 27, 2011. During his short tenure with MISI, he did not spend much time in the operating room. His employers observed him to be boastful about his capabilities and critical of the work of other surgeons. His view of himself and his capabilities as a neurosurgeon were observed to be far out of alignment with his actual skills.

20. Soon after Duntsch arrived in Dallas, Dr. Rimlawi (co-owner of MISI) suspected that something was wrong with Dr. Duntsch, whether it be impairment from drugs, alcohol, mental illness, or a combination thereof

21. Towards the end of his short tenure with MISI, he performed his first case at Baylor Plano, but he left for Las Vegas without making any plans for anyone to care for his patient. The surgery was performed on a Thursday, and Duntsch did not show up again until Monday. After the patient was in the hospital for one or two postoperative days and no doctor had been to see the patient, Baylor Plano called Dr. Rimlawi and told him the patient wanted to be discharged and didn't know why they were still there. When Dr. Rimlawi arrived at Baylor Plano, he was told by the Baylor Plano hospitalist that they had "tried and tried" to get in touch with Dr. Duntsch, but they could get no

response. When Dr. Duntsch arrived back in town on Monday, Dr. Rimlawi confronted him. Rimlawi asked Duntsch "who was supposed to see your patients over the weekend?" Duntsch replied that he didn't know because he was not "on call." This was the final straw on an already strained relationship and evidenced such a complete lack of regard for his patient that Duntsch's relationship with MISI ended a few short days later. MISI claims that Duntsch abandoned his treatment of patients around September 2011. MISI also claimed that Duntsch absconded with property and medical equipment owned by MISI and that despite MISI's demands, Duntsch refused to return MISI's property.

22. In addition, to the other problems with Dr. Duntsch, Rimlawi and others observed that Duntsch was extraordinarily self-centered. He was considered to be egocentric and made statements to Baylor Plano indicating that he was the best spine surgeon in Dallas and that none of the other neurosurgeons in Dallas were competent. Rimlawi told Baylor Plano that Duntsch was an egomaniac, mentally ill, an alcoholic, drug addict or a combination thereof. Nevertheless, Baylor Plano's concern was how they were going to get repaid the monies they had advanced.

23. Due to the money it had expended and in part due to the enormous profits it hoped to reap in the future, the Baylor Defendants welcomed Dr. Duntsch with open arms, despite the fact that Dr. Rimlawi had warned them of the problems with Dr. Duntsch and that he was a danger to patients. Among other things, Baylor Plano and/or one of its affiliates entered into a lease agreement with Duntsch in order to keep his practice located within the Baylor Plano service area. In addition, MISI has alleged that Baylor tortuously interfered with and/or enticed, encouraged, aided, and/or abetted Dr.

Duntsch to cease rendering services for MISI and open his own practice within the Baylor service area. A tacit agreement was reached that if Duntsch kept his practice in the Baylor service area and continued bringing patients to Baylor Plano and operating on them there that Baylor Plano would not enforce the repayment of loans or pursue any legal claims against MISI or Duntsch for violating the agreement.

24. In addition, the Baylor Defendants actively marketed and promoted Dr. Duntsch within the Baylor referral network and encouraged other "Baylor" doctors to refer cases to Duntsch. Baylor Plano also paid for a marketing assistant and expended marketing dollars to promote Duntsch's practice to the public.

25. During the time Duntsch was affiliated with Baylor Plano, he used and abused alcohol, illicit and prescription drugs. His pattern was to do cocaine for two to four days at a time. He would work and do cocaine. Following two to four days of cocaine use, he would "crash" for a day or two. Efforts to contact him during periods of time when he would "crash" were not fruitful. Nevertheless, Baylor Plano did not drug test Dr. Duntsch, did not investigate his unusual behavior, and did not heed the warnings it had received about Dr. Duntsch.

26. Shortly after his relationship with MISI terminated, the Baylor Defendants requested that Duntsch undergo drug testing, but he refused. The purpose of the drug testing was because Baylor Plano was intending to give Duntsch a prestigious title. Duntsch made at least five (5) attempts to dodge the drug testing and in fact never underwent the drug testing. Especially coupled with what they already knew about Duntsch, this should have raised red flag, but instead Baylor Plano did not press the issue, and he was thus allowed to continue to perform surgeries at Baylor's Plano

facility.

27. In addition to Duntsch's drug problem, he was an alcoholic. He would drink Vodka beginning in the morning. He would start by mixing it with juices but would convert to clear mixes throughout the day. In addition, he illegally obtained prescription drugs, such as Lortab, Xanax, and Oxycontin, for his own use. He was known to use alcohol while working as a neurosurgeon. Moreover, alcohol, drugs, and drug paraphernalia were found in his office at Baylor Plano.

28. Between September 2011 and March 2012, Duntsch's erratic and disorganized behavior continued. In addition, Baylor Plano employees and other staff participating in surgeries with him witnessed a startling lack of surgical skill by Duntsch resulting in high blood loss, malpositioning of hardware, misuse of hardware, and other complications. Other doctors described Dr. Duntsch as "dangerous" and "the worst surgeon they had ever seen."

29. Meanwhile, the Baylor Defendants continued to actively promote Dr. Duntsch and encourage other physicians associated with the Baylor system to refer their patients to Dr. Duntsch. In addition, the Baylor Defendants continued to pay for a marketing professional to promote Dr. Duntsch and his neurosurgery practice. Duntsch was under pressure to schedule surgeries so that Baylor Plano could get back the money it advanced him. During this period of time, Duntsch was known to be in the hospital administrator's office daily at times and multiple times weekly at others. His unusual and erratic behavior began to wear on the hospital administration at Baylor Plano.

30. On November 7, 2011, Duntsch was scheduled to perform surgery on Kenneth Fennell at Baylor Plano. The surgery had to be cancelled because Duntsch failed to

order the appropriate surgical hardware and instruments. This was not an uncommon occurrence. Duntsch was known to the Baylor Defendants to be extremely disorganized.

31. On November 14, 2011, Duntsch managed to get Kenneth Fennell to the operating room and to have the instruments that he intended on using. However, the surgery that was performed was an ill-conceived approach to Mr. Fennell's problems and, in essence, was an unnecessary surgery performed on a 68 year-old man that yielded no benefit to him whatsoever and set him up to require further surgery.

32. Duntsch's motivation for performing unnecessary and ill-conceived surgeries was in part due to pressure and expectation from the Baylor Defendants that he bring in revenue to pay them back for the monies they had advanced him and to turn enormous profits for them.

33. On December 6, 2011, Dr. Duntsch performed a surgery on Mary Efurd at the Baylor Plano location. He was assisted by his employee and girlfriend at the time, Kimberly Morgan, Ed.D, APRN, FNP-C, RNFA. This was also an unnecessary and inappropriate surgery, which did not address the patient's problems and set her up to require another surgery.

34. Thereafter, On December 30, 2011, Dr. Duntsch operated on patient Robert Passmore at Defendant Baylor's Plano facility. During the surgery, a surgeon present in the operating room saw that Duntsch was doing things that were unusual and alarming. At one point, the other surgeon grabbed Duntsch's hands/surgical instruments and told him to stop. This surgeon told Duntsch that he was dangerous and he would never operate with Duntsch again. This altercation was witnessed by Baylor Plano's OR staff,

employees, and Kimberly Morgan.

35. On January 11, 2012, Duntsch operated on patient Barry Morguloff at the Baylor Plano facility. At least two doctors in the OR with Dr. Duntsch, as well as the entire surgical team, witnessed his poor operating skill and inappropriate demeanor in the operating room.

36. On February 2, 2012, Dr. Duntsch operated on his lifelong friend and roommate, Jerry Summers. This surgery resulted in Mr. Summers being rendered a permanent quadriplegic. Doctors and other healthcare providers involved in the care of Jerry Summers were shocked because this is an unheard of outcome from an anterior cervical fusion. Summers reported to the ICU nursing staff that he had witnessed Duntsch using drugs the night before the surgery and that this was a common occurrence for Duntsch to use drugs before doing surgery. In addition, a prominent and well-regarded attorney who was representing Mr. Summers called the General Counsel of Baylor Plano and reported the allegations concerning Dr. Duntsch's drug use, and the General Counsel acknowledged that he was aware of the situation. The administration at Baylor Plano removed Dr. Duntsch from the case and brought in another surgeon to care for Mr. Summers. It is very unusual for a hospital to remove a physician from an ongoing case unless the physician is believed to be impaired or incapacitated in some way.

37. Inexplicably, Duntsch's surgical privileges were subsequently re-instated, and just one day later on March 12, 2012, Dr. Duntsch performed the very first surgery after having his privileges reinstated. The unsuspecting victim was Kelly Martin. The surgery was a L5-S1 laminectomy. It resulted in the patient's death from massive blood loss.

38.     At this point, Baylor Plano asks for Duntsch's resignation.  Contrary to their legal, ethical, and moral duty to report Dr. Duntsch to the National Practitioner Data Bank, Baylor Plano did not do so.  Subsequently, Dr. Duntsch hired a lawyer who negotiated a letter of reference from Baylor Plano.

39.     Dr. Duntsch did not operate from approximately March 13, 2012, until July 24, 2012.  He was applying to various hospitals around the DFW metroplex, but not having much luck.  However, he was approached by Dallas Medical Center, which was formerly known as R.H. Dedman Hospital in Dallas.  Dallas Medical Center was anxious to have a revenue-producing neurosurgeon on staff and granted him temporary privileges to perform five (5) surgeries at their facility while they completed their credentialing process.  Duntsch was anxious to operate as well since he had not been able to operate and desperately needed the money.

40.     As part of the initial screening of Dr. Duntsch, which paved the way for his temporary privileges, Dallas Medical Center contacted Baylor Plano.  Despite everything that had occurred at their facility, Baylor Plano sent a letter of recommendation for Duntsch to Dallas Medical Center, stating there were no adverse concerns, adverse events or adverse issues associated with Duntsch.  Therefore, Dr. Duntsch was allowed to operate on even more unsuspecting victims at other hospitals and outpatient surgical centers throughout the metroplex.  As a result, Dr. Duntsch either killed or seriously maimed multiple patients who were not privy to the problems Duntsch had while affiliated with Baylor Plano.

## V.
## CAUSES OF ACTION

### A. NEGLIGENCE OF BAYLOR REGIONAL MEDICAL CENTER AT PLANO

41. Plaintiff adopts and incorporates all preceding paragraphs and for further cause of action, pleads that Baylor Regional Medical Center at Plano was negligent in the following particulars:

    a. Failing to properly monitor and/or supervise Dr. Duntsch after they granted him privileges to perform spinal surgeries;

    b. Failure to notice Dr. Duntsch's pattern of intraoperative complications and poor surgical outcomes and to take action to prevent him from causing harm to patients;

    c. Failing to investigate Dr. Duntsch's odd behavior, lack of appropriate demeanor and extreme lack of organization; and

    d. Failing to investigate Dr. Duntsch's multiple excuses for not undergoing the drug testing that Baylor Plano had requested.

    e. Allowing Dr. Duntsch to operate on Baylor patients after having received warnings about his lack of competence and questionable mental stability and/or alcoholism and/or addiction.

### B. CREDENTIALING

42. Plaintiff adopts and incorporates all preceding paragraphs and for further cause of action, pleads that Baylor Regional Medical Center at Plano should never have granted surgical privileges to Duntsch and/or should have required him to operate only with a proctor and/or should have revoked his privileges prior to him being allowed to operate on Fennell.

### C. JOINT VENTURE

43. Plaintiff adopts and incorporates all preceding paragraphs and for further cause

of action, states that the Baylor Defendants are liable for the acts or omissions and injuries caused by Duntsch pursuant to the joint venture they created with Duntsch. Each of them had an express or implied agreement for Duntsch to perform spinal surgeries at the corporate Defendants' facility in Plano for the common purpose of recruiting patients and performing spinal surgery on them in return for money for each participant in the venture. They had a community of pecuniary interest in the common purpose with the corporate Defendants putting in up-front cash to get the venture started, and they each had an equal voice in the direction of the enterprise. Thus, they are each liable to Plaintiff for all injuries caused by the surgery Duntsch performed, pursuant to the joint venture arrangement with Baylor Plano. Duntsch performed negligently in the surgery performed at their facility on Fennell, as well as in the subsequent surgery.

### D. MEDICARE PRIVATE CAUSE OF ACTION

44. Plaintiff adopts and incorporates all preceding paragraphs and for further cause of action, pleads that Baylor Regional Medical Center at Plano received payment from Medicare for healthcare services rendered to Kenneth Fennell. The Plaintiff brings a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A), because the services rendered were for a procedure performed on the wrong body part. Thereby, Baylor Plano erroneously received payment from Medicare for services that were not medically necessary and are among those outlined in 42 U.S.C. § 1395(a). Plaintiff thereby seeks damages in an amount equal to two times the amount that Medicare paid Baylor Plano.

### E. AGENCY

45. Plaintiff adopts and incorporates all preceding paragraphs and for further cause

of action, pleads that all of the employees of Baylor Regional Medical Center at Plano were acting, not only in their individual capacities, but also as agents, representatives, and/or employees of Baylor Regional Medical Center at Plano and/or Baylor Healthcare System.  Under the doctrines of agency and *respondeat superior*, the Baylor Defendants are liable for the acts and omissions of their employees.

46. Pleading further, Plaintiff alleges that the Baylor Defendants are also responsible for the negligence of Christopher Duntsch, as he was their actual or apparent agent or employee, and/or by virtue of the joint venture relationship they had established with Duntsch in which they funded his work and his office practice, reached an agreement with him, which included actively marketing his services to referring physicians and the public, among other things.

47. The Baylor Defendants also had a non-delegable duty to Kenneth Fennell by virtue of their participation in the Medicare program.  By so participating, the Baylor Defendants voluntarily assumed the obligations of non-delegable duty set-out in 42 CFR § 482.12(e) and 42 CFR § 482.23.  These obligations were violated when Baylor Plano failed to provide safe surgical services to Fennell.

### F. PIERCING THE CORPORATE VEIL/ALTER EGO

48. The Corporate Defendant, Baylor Health Care System d/b/a Baylor Regional Medical Center at Plano, owned and operated Baylor Regional Medical Center at Plano and shared officers and directors.  The Corporate Defendant had the right to direct and control Baylor Regional Medical Center at Plano and had an authoritative voice and right of control over an aspect of the enterprise that the other did not, and without each

other, could not provide comprehensive healthcare services to Kenneth Fennell in the furtherance of the joint enterprise and common purpose of providing comprehensive patient care by and through its subsidiaries.

49. Moreover, the Corporate Defendant, acting through its apparent, ostensible, actual or by estoppel agents, officers, employees, subsidiaries and/or affiliated companies, organized and operated Baylor Regional Medical Center at Plano through the time of the rendition of medical services to Kenneth Fennell, that the ultimate parent corporation and/or Corporate Defendant should be treated as one and the same legal entity with regard to any liability to Plaintiff arising out of the claims made in this complaint due to the control asserted by the Corporate Defendant over the other and the inter-relationship of their business dealings, financial arrangements and the provision of the emergency room professional medical services, their corporate formalities should be disregarded, and each of them held vicariously liable for the conduct of the other.

50. Each of such acts and omissions, singularly or in combination with others, were a proximate cause of the injuries to Plaintiff.

## VI.
## GROSS NEGLIGENCE

51. Plaintiff adopts and incorporates by reference all preceding paragraphs and for further cause of action, alleges and states that the acts of the Defendants constitute gross negligence. The acts or omissions, when viewed objectively from the Defendants' standpoint at the time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and the Defendants had

actual, subjective awareness of the risk.

52.     Plaintiff would show that the above acts involved an extreme degree of risk and that Defendants had an actual and subjective awareness of this extreme degree of risk. Plaintiff would further show that these acts of gross negligence proximately caused Mr. Fennell's injuries and damages.

53.     In addition to the foregoing, and pleading in the alternative, the conduct of the corporate Defendants in allowing Duntsch to perform surgery on Fennell was with malice as that term was defined at common law; to wit, Baylor Plano acted with reckless disregard for the rights of others, thus injuring Fennell.  *See Shannon v. Jones*, 76 Tex. 141, 13 S.W. 477, 478 (1890) (defining malice as a reckless disregard for the rights of others).

54.     In addition, and pleading in the alternative, if Texas Civil Practice and Remedies Code § 41.001(7) is deemed to require proof that the corporate Defendants had actual subjective intent to harm Fennell on the occasion in question before liability attaches, then Plaintiff says that the legislature's act of deleting § 41.001(7)(B) of the definition of "malice" (that allowed proof of gross negligence) violated the "Open Courts" provision of the Texas Constitution by eliminating a common law right arbitrarily in light of the purposes of the statute leaving only an impossible condition before liability will attach. *See* Tex. Const. Art. I § 13.  In the past, § 41.001(7) passed constitutional muster because section (B) was included.  *See St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 506 (Tex. 1997) ("Considering the Legislature's pronouncement that "malice" need not be directed toward a specific individual in the context of exemplary damages, it does not follow that in the context of peer review, the committee must

necessarily act with malice toward a specific patient for that patient to prove his or her case.). With the elimination of section (B) in 2003, Plaintiff says the statute now violates the Texas Constitution if it requires an actual subjective intent to harm or injure the specific patient involved before liability attaches.

55. In addition to the foregoing, and pleading in the alternative, the conduct of the corporate Defendants in allowing Duntsch to perform surgery on Fennell was with malice as that term is defined in Texas Civil Practice and Remedies Code § 41.001; to wit, Baylor Plano's conduct rises to the level of intent to harm.

56. In addition to the foregoing, and pleading in the alternative, the conduct of the corporate Defendants in allowing Duntsch to perform surgery on Fennell was with malice as that term is defined in Texas Civil Practice and Remedies Code § 41.001; to wit, Baylor Plano's conduct rises to the level of specific intent to harm Fennell.

## VII. DAMAGES

57. As a proximate result of the acts or omissions described above, singularly and collectively, Plaintiff has been injured, sustained damages, and requests compensation in a sum far in excess of the minimum jurisdictional limits of this Court. Each and all of the violations of the standard of care outlined herein were a proximate cause of damage, injury and harm to Kenneth Fennell.

58. Plaintiff Kenneth Fennell would show that he has suffered past and future medical and healthcare expenses; past and future physical pain; past and future mental anguish; past and future disfigurement; and past and future physical impairment for which he seeks monetary damages. In addition, Plaintiff seeks exemplary damages;

pre-judgment interest; post-judgment interest; costs of court; and such other and further relief to which he may be entitled.

## VIII.
## JURY DEMAND

59.     Plaintiff demands a trial by jury.

## PRAYER

60.     FOR THESE REASONS, Plaintiff Kenneth Fennell, Individually, respectfully prays that the Defendants be cited to appear and answer herein, and that upon final hearing hereof, Plaintiff receives judgment from the Defendants for damages sought herein; costs of court; prejudgment interest at the highest rate allowed by law; interest on the judgment at the highest legal rate from the date of judgment until collected; and any and all such other and further relief, in law and in equity, to which Plaintiff may show himself justly entitled.

Respectfully submitted,

**VAN WEY LAW, PLLC**


BY: **/s/ Kay L. Van Wey**
    Kay L. Van Wey
    State Bar No. 20461950

12720 Hillcrest Road, Suite 725
Dallas, Texas 75230
(214)329-1350
(800) 582-1042 Facsimile
kay@vanweylaw.com

**COUNSEL FOR PLAINTIFF**

4843-9120-3352, v. 2